# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JAMES E. DUNMORE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )    Case No. 3: 16-CV-171-MAB |
| | ) |
| LOUIS SHICKER, PHIL MARTIN, | ) |
| ILLINOIS DEPARTMENT OF | ) |
| CORRECTIONS, and JOHN B. COE, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

Pending before the Court are two motions for summary judgment and supplements to those motions (Docs. 82, 84, 99, 101), as well as two motions to exclude the testimony of Plaintiff's exert witnesses (Docs. 98, 100) all of which were filed by Defendants Louis Shicker, Phil Martin, the Illinois Department of Corrections, and John Coe. For the reasons stated below, Defendant Coe's request for summary judgment is granted; the IDOC Defendants' request for summary judgment is denied in part and moot in part; the motion to exclude the testimony of retained expert Brendan Tanner is granted; and the motion to exclude the testimony of retained expert Peter Combs is denied.

## PROCEDURAL BACKGROUND

Plaintiff James E. Dunmore ("Plaintiff") brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 alleging that he was wheelchair-bound and prison officials

were not providing him with constitutionally sufficient physical therapy services or with accessible toileting facilities on the prison yard. Following a threshold review of the complaint pursuant to 28 U.S.C. §1915A, Plaintiff was permitted to proceed on the following claims:

> Count 1: Phil Martin, Louis Shicker, and John Coe were deliberately indifferent to Plaintiff's serious medical condition in violation of the Eighth Amendment when they "failed to ensure that Plaintiff receive adequate physical therapy and transfer him to a facility with an adequate physical therapy program";[1] and

> Count 2: The IDOC violated the Americans with Disabilities Act and the Rehabilitation Act when it "failed to install wheelchair accessible toilets" on the prison yard

(Doc. 7).

On May 15, 2019, Dr. Coe and the IDOC Defendants filed motions for summary judgment on the merits of Plaintiff's claims (Docs. 82, 84). Shortly thereafter, however, the Court gave the parties more time to complete expert discovery, and allowed supplemental briefing related to the motions for summary judgment (Doc. 91). Dr. Coe and the IDOC Defendants filed their supplemental briefs on August 30, 2019, along with

---

[1] The threshold order reads as though Plaintiff was also permitted to proceed against the IDOC on Count 1 to the extent that he was seeking injunctive relief (Doc. 7, pp. 3, 4). But the IDOC, as a state agency, "is not a 'person' that can be sued under section 1983." *Owens v. Godinez*, 860 F.3d 434, 438 (7th Cir. 2017). Instead of the agency itself being named as a defendant, the proper defendant was the warden, or another agency official, in their official capacity who would be responsible for carrying out any injunctive relief that was ordered. *Tolentino v. Baker*, 679 Fed. Appx. 503, 504 (7th Cir. 2017); *Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011). Thus, insofar as the IDOC was a Defendant to Count 1, it is dismissed. No additional defendant, such as the warden, need be named because, as explained later in this Order, Plaintiff's claims for injunctive relief are moot.

motions to bar the testimony of Plaintiff's physical therapy expert and ADA expert (Docs. 98, 99, 100, 101). Plaintiff filed responses in opposition to the motions for summary judgment and the motions to bar his experts (Docs. 104, 105, 106, and 107). Defendant Coe then filed a reply brief in support of his motion for summary judgment (Doc. 108). No other reply briefs were filed.

The summary judgment briefing narrowed the scope of the claims in this case. To begin with, in his response to the IDOC Defendants' motion for summary judgment, Plaintiff withdrew his claim for deliberate indifference as to Louis Shicker and Phil Martin in Count 1 (Doc. 107). Therefore, Shicker and Martin will be dismissed as Defendants in this case, and given the current stage of litigation, the dismissal will be with prejudice. The dismissal renders the IDOC Defendants' motion for summary judgment moot as to Shicker and Martin.

Second, after Defendants filed their initial summary judgment motions, Plaintiff was transferred from Lawrence to Dixon Correctional Center (Doc. 92). Therefore, to the extent Plaintiff was seeking injunctive relief as to Count 1 for deliberate indifference or Count 2 for violations of the ADA/ Rehab Act, that request is now moot. *See, e.g., Lehn v. Holmes*, 364 F.3d 862, 871 (7th Cir. 2004) ("[W]hen a prisoner who seeks injunctive relief for a condition specific to a particular prison is transferred out of that prison, the need for relief, and hence the prisoner's claim, become moot") (discussing *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1995) (*per curiam*)). The only relief that remains available to Plaintiff on Counts 1 and 2 is money damages.

That means the Court is left to decide whether summary judgment is appropriate for Defendant John Coe on Plaintiff's deliberate indifference claim in Count 1 and for the IDOC on Plaintiff's ADA/Rehab Act claim in Count 2.

**FACTUAL BACKGROUND**

Plaintiff is eighty-one-years-old and has been in IDOC custody since 2004 (Doc. 107-1, p. 4). He has multiple serious medical conditions, such as diabetes, hypertension, high cholesterol, hepatitis C, heart disease, obesity, poor circulation and various orthopedic problems, including longstanding, progressively worsening back pain (*see, e.g.,* Doc. 83-3, pp. 4–5; Doc. 83-2, pp. 15, 16). In November 2011, while Plaintiff was incarcerated at Menard Correctional Center, he underwent posterior spinal fusion surgery at Saint Louis University (Doc. 1, p. 3; Doc. 83-3, pp. 2, 39; Doc. 85-2, p. 17; Doc. 106-5, p. 24).[2] Following a week in the hospital, he was sent back to Menard, where he was housed in the infirmary (Doc. 107-1, p. 9). Plaintiff did not have any physical therapy at Menard (*Id.* at p. 10). He was transferred from Menard to Lawrence Correctional Center on August 12, 2012, in order to receive physical therapy to help with his recovery (*Id.*). At the time he arrived at Lawrence, he was wheelchair bound, and unable to walk (*Id.* at pp. 10, 35).

---

[2] The summary judgment briefing is inconsistent as to the date of Plaintiff's back surgery. At times, the briefing and exhibits indicate the surgery was in 2011 (*e.g.,* Doc. 85, p. 2; Doc. 106, p. 32;), while at other times, the briefing and exhibits indicate the surgery was in 2012 (*e.g.,* Doc. 107-1, pp. 9–10; Doc. 106, p. 5). After carefully reviewing the pleadings and all of the evidence in this case, the Court is satisfied Plaintiff's surgery occurred in November 2011.

The medical records indicate Plaintiff was evaluated at Lawrence by Dr. Emily Thomann, a physical therapist, on October 31, 2012 (Doc. 83-3, p. 39–40; Doc. 85-2, p. 17). She ordered a four-week course of physical therapy, the goal of which was for Plaintiff to increase his leg strength and to be able to walk at least 50 feet with a walker (Doc. 83-3, pp. 39–40; Doc. 85-2, pp. 7, 17). If he was able to walk at least 50 feet, he would be able to ambulate within his cell house and from his cell to the ADA shower (Doc. 85-2, p. 7).

During this initial course of physical therapy, Plaintiff was able to ambulate short distances with assistance, albeit with considerable pain (Doc. 85-2, pp. 7–10). Dr. Thomann reevaluated Plaintiff on November 28th and continued his physical therapy because he demonstrated improved strength in his legs and he was progressing towards walking with an assistive device (Doc. 85-2, pp. 11, 18). Plaintiff's ambulation continued to improve during his next two sessions, however, he reported that his pain was always present, and nothing seemed to help (*Id.* at pp. 11–12). At his next session, however, he reported that he had fallen twice because his legs gave out (*Id.* at p. 13). The physical therapy assistant noted that Plaintiff "states he is unable to walk. The pain makes him cry. Reports that he stays in bed most of the time" (Doc. 107-1, p. 19).

Dr. Thomann evaluated Plaintiff for a third time on January 9, 2013 (Doc. 85-2, p. 13; Doc. 83-3, pp. 42–43). Plaintiff told Dr. Thomann that his legs were getting weaker, his back pain had increased, and he had ceased doing his home exercise program (Doc. 85-2, p. 19). Dr. Thomann noted that Plaintiff was not making any progress with physical therapy and was declining physically (*Id.*). Consequently, she discharged him from

physical therapy and recommended that he follow up with the medical doctor (*Id.* at pp. 13–14, 19).

Plaintiff claims "it was his understanding" from Dr. Thomann that the physical therapy program at Lawrence was not "advanced enough to help [him]" and he needed "to be in a more advanced physical therapy program" (Doc. 107-1, pp. 20, 29). Dr. Thomann, however, testified that she did not believe that the program at Lawrence was inadequate or lacked any equipment that might benefit him (Doc. 83-4, pp. 14–15). Plaintiff's expert witness, Dr. Brendan Tanner, opined that the plan of care and the physical therapy treatment he received was appropriate (Doc. 104-1, p. 3). He did not believe "physical therapy services at a difference facility would have altered the outcome, based on the patient's pain level and medical status" (*Id.*).

Following the discontinuation of physical therapy, Plaintiff followed up with the medical staff as instructed (Doc. 106-4, p. 8). An x-ray of his back was taken and showed that the hardware in his back was intact and the appearance of his spine was unchanged (*Id.* at p. 24). He was given prescriptions for Ultram and Neurontin to manage his pain (*Id.* at pp. 8, 11, 12).[3]

---

[3] Ultram is a brand name for tramadol, which is an opiate analgesic used to relieve moderate to moderately severe pain. U.S. National Library of Medicine, Medline Plus, *Tramadol,* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html (last visited Dec. 10, 2019). For the sake of ease, the Court uses the word Ultram throughout this order, even when the medical records use the word tramadol.

Neurontin is a brand name for gabapentin, which is an anticonvulsant medication that is used off-label for treatment of neuropathic pain. U.S. National Library of Medicine, Medline Plus, *Gabapentin,* https://medlineplus.gov/druginfo/meds/a694007.html (last visited Dec. 10, 2019).

Defendant Dr. John Coe became the medical director at Lawrence in May 2013 (Doc. 83-2, pp. 2, 15). He saw the Plaintiff for the first time in early August 2013 at a Chronic Clinic visit for Plaintiff's other medical problems (Doc. 83-3, pp. 4–5). At that visit, Dr. Coe renewed Plaintiff's prescriptions for Neurontin and Ultram, and scheduled him for another visit to fully evaluate his chronic pain issues (*Id.* at pp. 4–6). At the second visit on August 26, 2013, Dr. Coe diagnosed Plaintiff with partial paraplegia from spinal stenosis, meaning that "his spinal cord was pinched off enough that he was having the paraplegia problems, which means muscle weakness, possibly spasm, pain, numbness" (*Id.*; Doc. 83-2, p. 10). The doctor determined Plaintiff should continue to take Neurontin and Ultram to help with his pain, and he also ordered a physical therapy consult (Doc. 83-3, p. 6). For reasons unknown to Dr. Coe, Plaintiff was never scheduled to see the physical therapist (Doc. 83-2, pp. 12, 15). According to Dr. Coe, the nurses were responsible for taking his order and then coordinating with the physical therapists to get Plaintiff scheduled (*Id.* at p. 12).

Dr. Coe saw Plaintiff multiple times over the next ten months, primarily for issues other than his back pain (*see* Doc. 83-3, pp. 8–13). During this time, Dr. Coe continued to prescribe Plaintiff Neurontin and Ultram for his pain, and he also prescribed Baclofen (*Id.* at p. 12).[4] After beginning the Baclofen, Plaintiff reported to Dr. Coe that his cramps and spasms were "nearly gone," his legs were not sore, and he could move his legs better

---

[4] Baclofen is a muscle relaxant and antispasmodic prescribed to treat muscle spasms, pain, and stiffness in people with spinal cord damage (Doc. 83-2, p. 10). *See also* U.S. National Library of Medicine, Medline Plus, *Baclofen,* https://medlineplus.gov/druginfo/meds/a682530.html (last visited Dec. 10, 2019).

(Doc. 83-3, p. 14). Shortly thereafter, however, Plaintiff fell out of his wheelchair and complained to a nurse of severe back pain (Doc. 83-3, pp. 15–16; Doc. 106-4, p. 18). He was placed in the infirmary for 23-hour observation (Doc. 83-2, p. 11; Doc. 106-4, pp. 18–19). Plaintiff reported to Dr. Coe the next day that he was back to his regular level of pain (Doc. 83-3, p. 17). An x-ray of Plaintiff's lumbar spine showed his spine was unchanged (*Id.* at p. 18; Doc. 106-4, p. 25).

Dr. Coe saw Plaintiff a week later and Plaintiff again reported that he was back to his regular level of pain (Doc. 83-3, p. 18). Plaintiff also told Dr. Coe that he wanted "to go to Dixon, where he believes he will get physical therapy that will get him walking. He claims [physical therapy] was inadequate" (*Id.*). Dr. Coe wrote in the medical records, "PT was talked to and could re-evaluate. At this time I will not change anything" (*Id.*; Doc. 83-2, p. 11–12). Dr. Coe testified this note meant that "I talked to physical therapy, and they would - - they said they would reevaluate him" (Doc. 83-2, pp. 11–12). It is unclear, however, if Dr. Coe ever actually wrote an order for a physical therapy evaluation (*see* Doc. 83-3). Dr. Coe has no knowledge of the capabilities of the medical facility at Dixon, including whether Dixon offered better physical therapy than Lawrence (Doc. 83-2, p. 20).

Dr. Coe next saw Plaintiff in June 2014, and he documented that Plaintiff's back and left hip pain was worse (Doc. 83-3, p. 19). He ordered Motrin three times a day (*Id.*). Dr. Coe saw Plaintiff several times in August and September 2014 for issues other than his back pain (Doc. 83-3, pp. 20–27). Plaintiff was next evaluated by a nurse in October

2014 for complaints of mid back, right shoulder, and right arm numbness and pain (Doc. 83, pp. 5–6; Doc. 106, p. 4). He was referred to Dr. Coe, who ordered cervical spine x-rays (Doc. 83, pp. 5–6; Doc. 106, p. 4).[5] Dr. Coe noticed some abnormalities on the x-ray, and he prescribed Plaintiff a "sling and permit" (Doc. 83-3, p. 27). At a follow-up visit on December 4th, Dr. Coe prescribed a cervical collar for Plaintiff (*Id.* at p. 28). Dr. Coe testified that the pain medications that he had already prescribed for Plaintiff's back pain would have also been effective for his neck, shoulder, and arm pain (Doc. 83-2, p. 15). Dr. Coe further testified that Plaintiff's neck, shoulder, and arm pain were new problems, unrelated to his lumbar spine problems, and it was not appropriate for Plaintiff to do physical therapy for his back at this time because he would have needed to use his arms to help him walk on the parallel bars or with a walker and "that would be a problem while . . . the neck was acting up" (*Id.*).

The next time Dr. Coe saw Plaintiff for his pain was in August 2015 (Doc. 83-3, p. 30). Dr. Coe noted that Plaintiff was "getting worse as always with pain," despite the pain medication he was taking (*Id.*) Plaintiff also had edema (fluid retention) in both his legs, which Dr. Coe testified was likely because Plaintiff had decreased circulation since he could not use his legs very well, was sitting in a wheelchair all the time, inactive, and overweight (Doc. 83-2, p. 12). In Dr. Coe's opinion, physical therapy would not have been

---

[5] The parties agree that Plaintiff saw a nurse on October 16, 2014, for complaints of mid back, right shoulder, and right arm numbness and pain, that Dr. Coe ordered cervical spine x-rays on October 22nd and saw Plaintiff at a follow-up appointment on October 24th (*see* Doc. 83, pp. 5–6 *citing* Ex. B, 161, 162, 898; Doc. 106, p. 4).). The Court was unable to locate the medical records cited for these events, and therefore cites only to the parties' briefs.

helpful for Plaintiff's leg edema (*Id.*). Instead, Dr. Coe ordered TED (compression) hose and a diuretic (water pill) for the edema, as well as Ultram and Neurontin for Plaintiff's pain (Doc. 83-3, p. 30).

In January 2016, Dr. Coe gave Plaintiff an ice permit, at Plaintiff's request, so that he could use ice to alleviate his arthritic pain (Doc. 83-3, p. 32). In February 2016, Plaintiff told Dr. Coe that he wanted "rehabilitation" (Doc. 83-3, p. 33). Dr. Coe noted "[inmate] had PE a long time ago, he [illegible] for new consult. Discussed w/ Lorie Cunningham HCUA. We will order a new PT eval to see if offender is willing to get PT" (*Id.*). Once again, there is no indication that the physical therapy evaluation was ever scheduled or performed (*see* Doc. 83-3; Doc. 83-2, pp. 12, 15).

In June 2016, Plaintiff told Dr. Coe that he "want[ed] more Neurontin" and Dr. Coe increased his prescription (Doc. 83-3, p. 34). In July 2016, Dr. Coe saw Plaintiff multiple times for cellulitis in his leg, and Dr. Coe also renewed Plaintiff's permit for ice (*Id.* at pp. 35–38). Dr. Coe left his employment as the medical director at Lawrence on July 31, 2016 (Doc. 83-2, p. 12).

Plaintiff finally underwent a physical therapy evaluation by Dr. Thomann on January 4, 2017 (Doc. 83-3, pp. 44–45). The goal of therapy was no longer to get Plaintiff walking; this time it was to help manage his pain (Doc. 83-4, pp. 13, 18–19). A month later, Plaintiff told Dr. Thomann that his back "feels terrible and [physical therapy] is not helping" (Doc. 83-3, p. 46; Doc. 83-4, p. 20). He told her he was "sleeping in his wheelchair because he cannot lay down because of pain" and he "cannot always do home exercise

program stretch [because] of pain" (Doc. 83-4, p. 20). Dr. Thomann discharged Plaintiff from physical therapy because he did not meet his goals and was no longer progressing, and she felt he had reached "max rehab potential" (*Id.* at pp. 20–21).

Plaintiff was sent back for a third round of physical therapy in June 2018 (Doc. 83-3, p. 48; Doc. 83-4, pp. 21–22). Dr. Thomann discharged Plaintiff approximately a month and a half later, however, because he had not made any progress and the therapy exercises increased his pain (Doc. 83-4, pp. 22–23; Doc. 83-3, p. 50).

### A.    Facts Related to Plaintiff's ADA Claim

As previously mentioned, Plaintiff could not walk on his own by the time he was transferred to Lawrence and he was confined to a wheelchair (Doc. 107-1, pp. 10, 35). ADA inmates, like Plaintiff, are allowed to go to the yard at Lawrence (Doc. 85, p. 7; Doc. 107, p. 4). There is a porta-potty on the yard, but it is not wheelchair-accessible (Doc. 107-2, p. 10). According to Plaintiff, there were three occasions over a two-year period when he wet himself while out on the yard because he was not able to get an officer to escort him back into the cellhouse to use the bathroom (Doc. 107-1, pp. 34, 35). The first was on March 28, 2013 (*Id. citing* Doc. 1, p. 7).[6] [7]  At that time, according to Plaintiff, ADA inmates

---

[6] Plaintiff's complaint is a verified complaint—meaning he declared under penalty of perjury that the allegations were true and he signed the declaration (Doc. 1). *Ford v. Wilson*, 90 F.3d 245, 247 (7th Cir. 1996). The complaint is therefore the equivalent of an affidavit and can be considered as evidence at summary judgment. *Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017) (quoting *Ford*, 90 F.3d at 246).

[7] Plaintiff did not provide dates, or approximate dates, of the other two occasions when he allegedly soiled himself on the yard (*see* Doc. 107-1).

on the yard were not allowed to go back to the cellhouse to use the bathroom.[8] In the event they managed to get a guard to take them inside to use the bathroom, they were not allowed to go back out to yard after they were finished (*see* Doc. 1, p. 7; Doc. 107-1, p. 34).[9] Plaintiff claims that he asked a number of times to go into the cell house to use the restroom but he was ignored by correctional officers (Doc. 1, p. 7). As a result of being ignored, he urinated on himself (*Id.*).

Plaintiff testified that "at some point" before Deana Brookhart became the assistant warden of programs at Lawrence, "they started letting us go back in" to the cellhouse to use the bathroom, but "we couldn't come back to the yard, we'd lose our yard privileges if we had to use the bathroom" (Doc. 107-1, p. 34). Plaintiff acknowledged that since Dr. Brookhart came to Lawrence, the policy is that ADA inmates on the yard can go into the cellhouse to use the bathroom and then go back out to the yard (*Id.*). However, he could not say whether the policy was actually followed because he stopped going to the yard (*Id.*). He testified that he did not "want to be caught in that position again where I soiled myself" and he did not trust that the problem had been resolved,

---

[8] Plaintiff was asked "Are you allowed to come back in to go to your cell if you need to?" and he responded, "Now—now we are, not when I filed that lawsuit or the grievance. Now we are since Dr. Burkhart's [sic] been here." (Doc. 107-1, pp. 33–34). Plaintiff filed a grievance on March 29, 2013—the day after he allegedly soiled himself on the yard—and he filed this lawsuit in February 2016 (Doc. 1, p. 8). Dr. Deana Brookhart became the assistant warden of programs at Lawrence at some point in 2016 (*see* Doc. 107-2).

[9] The complaint alleges: "The Plaintiff had asked a number of times to go into the cell-house to use the rest-room, but he was ignored and was not allowed to go into the cell-house, and was forced to urinate on himself. Plaintiff . . . had spoken with two or more Unit C/O's about this problem and was told, to stay in his cell at yard time, or keep going through the same things; And if he was to get someone to let him come into the cell-house, he would not be allowed to go back out to the yard, so he would be deprived his yard out time." (Doc. 1, p. 7).

stating "I don't trust it . . . I don't go to the yard because I don't trust them. . . . I just don't trust the system" (*Id.*).

For their part, Defendants presented evidence that on May 15, 2013—approximately a month and a half after Plaintiff allegedly soiled himself on the yard—Beth Tredway, the assistant warden of programs at Lawrence at the time, issued a memorandum to "security staff" at Lawrence regarding ADA offenders on the yard (Doc. 85-10). The memorandum stated:

> When ADA Offenders are out on the yard for the two hours and need to use the bathroom, security must cooperate with this need and escort the offender back into their designated housing unit to utilize the bathroom.
>
> The ADA Offender is allowed to return back to the yard escorted by security during the transition. At no time, can we deny them this right to participate in yard based on our portajohns not being handicap accessible.

(*Id.*). In August 2016, Dr. Brookhart, who was by then the new assistant warden of programs, reissued the directive advising staff that during yard or dayroom times, wheelchair and ADA offenders must be allowed to return to their housing units to use the restroom and are then allowed to return to complete their yard or dayroom time (Doc. 85-11).

In addition to the outdoor yard, Plaintiff was given a permit for the indoor ADA gym shortly after his arrival at Lawrence (Doc. 107-1, p. 11). There is a restroom in the ADA gym, and Plaintiff was able to transfer and use that bathroom (*Id.* at p. 33). According to Plaintiff, ADA inmates went to the ADA gym on Friday afternoons (*Id.* at

p. 11). Neither party presented any evidence regarding how often and for how long inmates were permitted to go to the outdoor yard at Lawrence (*see* Doc. 85, Doc. 107).

Plaintiff also had an ADA attendant at Lawrence who helped him with his day-to-day activities, *e.g.*, getting to and from chow and all calls, cleaning his cell, making his bed, etc. (Doc. 107-1, p. 12). However, there were stretches of time when Plaintiff did not have an attendant, including the times when he wet himself on the yard (*Id.* at p. 35).

## DISCUSSION

Summary judgment is proper when the moving party "shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted). In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, and the court may not "choose between competing inferences or balance the relative weight of conflicting evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014) (citations omitted); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). Instead, "it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen*, 763 F.3d at 836.

## A. DELIBERATE INDIFFERENCE

The Eighth Amendment's proscription against cruel and unusual punishment imposes an obligation on states "to provide adequate medical care to incarcerated individuals." *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1072 (7th Cir. 2012) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials violate this proscription when they act with deliberate indifference to the serious medical needs of an inmate." *Holloway*, 700 F.3d at 1072 (citations omitted). To succeed on a claim for deliberate indifference, a plaintiff must demonstrate that they suffered from an "objectively, sufficiently serious" medical condition and that the defendant acted with a "sufficiently culpable state of mind." *Id.*

Here, Dr. Coe does not dispute that Plaintiff was suffering from a serious medical condition (*see* Doc. 83, p. 13). Therefore, the only question for the Court is whether Dr. Coe acted with deliberate indifference to Plaintiff's medical needs. "A prison official is deliberately indifferent only if he 'knows of and disregards an excessive risk to inmate health or safety.'" *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). In other words, "[t]he defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference." *Whiting*, 839 F.3d at 662 (quoting *Farmer*, 511 U.S. at 837). "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Holloway*, 700 F.3d at 1073 (citation omitted). It is

"something akin to recklessness." *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 50 (2019) (quoting *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011).

In the context of medical professionals, "evidence of medical negligence is not enough to prove deliberate indifference." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) (citation omitted). *Accord Whiting*, 839 F.3d at 662–63 ("[A]n *inadvertent* failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain.'" (citation omitted)). Rather, the medical professional may be held to have displayed deliberate indifference only if their decision "is such a substantial departure from accepted professional judgment, practice, or standards" as to demonstrate that the decision was not actually based on professional judgment. *Rasho v. Elyea*, 856 F.3d 469, 476 (7th Cir. 2017) (citation omitted). *See also Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008) (quoting *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998) ("A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances'")).

### 1. Expert Testimony

Brendan Tanner, PT, DPT, NCS, is a doctor of physical therapy and a licensed physical therapist in Missouri (Doc. 98-1). Plaintiff retained Dr. Tanner as an expert witness on issues directly regarding the purportedly inadequate physical therapy and related medical care that Plaintiff received from Dr. Coe (Doc. 104; *see also* Docs. 98-1, 98-2). Defendant Dr. Coe takes issue with one of Dr. Tanner's opinions (Doc. 98). In

particular, Dr. Tanner opined that after Plaintiff fell in late 2012, which led to an increase in pain, "it would have been appropriate" to order further imaging studies, such as an MRI or a CT scan in order to provide "further insight" into the nature and cause of Plaintiff's increased pain, which in turn "would have assisted the staff in providing appropriate treatment measures to both decrease [Plaintiff's] pain level and increase his ability to participate and benefit from [physical therapy] services towards greater functional mobility and participation in life activities" (Doc. 98-1, p. 2). Dr. Coe argues that this opinion exceeds the scope of the allegations in Count 1 (Doc. 98). He further argues that Dr. Tanner is not qualified to opine on the standard of care for a physician, or whether and what type of diagnostic imaging should have been ordered (*Id.*).

Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert* govern the admissibility of expert testimony. *E.g.*, *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 674 (7th Cir. 2017); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)). Under this framework, the district court is required "to act as an evidentiary gatekeeper ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand." *Krik*, 870 F.3d at 674 (7th Cir. 2017) (citing *Daubert*, 509 U.S. at 589). The gatekeeper role requires the court to undertake a three-step analysis: "[i]t must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (quoting *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)).

In order to resolve the motion to bar Plaintiff's expert, the Court must first evaluate the scope of Plaintiff's deliberate indifference claim. In his original complaint, Plaintiff indicated that he was transferred to Lawrence to receive physical therapy, which was started in October 2012 but discontinued less than three months later due to his lack of progress (Doc. 1, pp. 3–4). He further indicated that the physical therapy program at Lawrence had only been in place for about a year and that it did not have "very much . . . to offer" him. (*Id.*). He claimed he needed to be in a more advanced physical therapy program, and he asked multiple prison officials and medical providers to transfer him to a facility with such a program (*Id.* at p. 4). Based on these allegations, Plaintiff was permitted to proceed, in pertinent part, on a claim that Defendant Dr. John Coe was deliberately indifferent to his serious medical needs when he "failed to ensure that Plaintiff receive adequate physical therapy and transfer him to a facility with an adequate physical therapy program" (Doc. 7).

In his response to the motion for summary judgment, Plaintiff argues that Dr. Coe was deliberately indifferent for additional reasons (Doc. 106, pp. 2, 3). Specifically, Plaintiff argues that Dr. Coe was deliberately indifferent not just because he failed to ensure that he received adequate physical therapy but also because he failed to order an MRI or a CT scan to determine the source of Plaintiff's pain, and he continued a plan of treatment—namely, prescribing Plaintiff pain medication—proven to be ineffective (*Id.*).

Dr. Coe takes exception to the shifting nature of Plaintiff's Eighth Amendment claim (Doc. 108). He argues that the only facts pleaded in the complaint pertain to Dr.

Coe's alleged failure to ensure that Plaintiff received adequate physical therapy (*Id.*). Plaintiff did not plead any facts regarding an alleged failure to provide diagnostic imaging or inadequacy of pain medication management, and therefore Dr. Coe argues those issues should not be considered by the Court (*Id.*). The Court agrees with Dr. Coe.

"[A] party may neither amend its pleadings by argument in opposition to summary judgment nor introduce new theories of liability in opposition to summary judgment." *Colbert v. City of Chicago*, 851 F.3d 649, 656 (7th Cir. 2017) (quoting *Whitaker v. Milwaukee Cty., Wis.*, 772 F.3d 802, 808 (7th Cir. 2014)). More specifically, "parties cannot 'add entirely new factual bas[e]s . . . not previously presented." *Colbert*, 851 F.3d at 656 (quoting *Whitaker*, 772 F.3d at 808). Case law emphasizes that "it is factual allegations, not legal theories, that must be pleaded in a complaint." *Whitaker*, 772 F.3d at 808. Accordingly, when a plaintiff does plead legal theories, it can later alter or refine those theories at summary judgment without a formal amendment to the complaint. *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859 (7th Cir. 2017). The rule is different, however, when a plaintiff seeks to introduce a new factual basis for his claim that was not previously presented in the pleadings. *Id.* at 859, 860; *Whitaker*, 772 F.3d at 808. "An attempt to alter the factual basis of a claim at summary judgment may amount to an attempt to amend the complaint" and "the district court has discretion to deny the *de facto* amendment and to refuse to consider the new factual claims." *Chessie*, 867 F.3d at 859, 860 (citations omitted).

Here, in his response to the motion for summary judgment, Plaintiff attempts to change the factual theory behind Dr. Coe's alleged deliberate indifference by adding arguments that Dr. Coe failed to order additional diagnostic imaging and persisted in prescribing an ineffective regimen of pain medication. These purported failures were not mentioned in the original complaint (*see* Doc. 1), and Plaintiff never sought to amend his complaint to add such allegations.

Of course, a pleading can be "constructively" amended when both parties expressly or impliedly consent to the constructive amendment. FED. R. CIV. P. 15(b)(2) ("When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue."); *Hutchins v. Clarke*, 661 F.3d 947, 957 (7th Cir. 2011) (applying Rule 15(b)(2) to new issue raised in summary judgment briefing); *Torry v. Northrop Grumman Corp.*, 399 F.3d 876, 877–879 (7th Cir. 2005) (same). The test for permitting a constructive amendment under Rule 15(b)(2) is "whether the opposing party had a fair opportunity to defend and whether he could have presented additional evidence had he known sooner the substance of the amendment." *Hutchins*, 661 F.3d at 957.

Here, Defendant Coe expressly objects to litigating these new issues (*see* Docs. 98, 99, 108). It does not appear to the Court that Defendant Coe somehow implicitly consented to it. For example, there is nothing that shows Plaintiff asked about these new

factual issues in written discovery. While the medications prescribed to Plaintiff to manage his pain were touched on at various points during Dr. Coe's deposition, the line of questioning in no way suggested that Plaintiff was pursuing Coe's pain medication management as a basis for liability (*see* Doc. 83-2, pp. 3, 10, 13, 17). The same goes for the issue of diagnostic imaging (*see id.* at pp. 5, 13). If defense counsel had implicitly agreed to litigate his client's liability on these new issues, then counsel certainly would have sought to develop substantially more evidence (*see* Doc. 108). *See Reynolds v. Tangherlini*, 737 F.3d 1093, 1106 (7th Cir. 2013) ("[A] court will not imply a party's consent to try an unpleaded claim merely because evidence relevant to a properly pleaded issue incidentally tends to establish an unpleaded claim.") (internal quotation marks and citation omitted). Furthermore, Defendant Coe moved for summary judgment based only on the allegations contained in the original complaint and the claim Plaintiff was permitted to proceed on (*see* Docs. 83, 99). His motion did not mention the paid medication management issue or the diagnostic imaging issues (*see* Doc. 83), which also suggests he had not impliedly consented to litigating these issues because otherwise he would have moved for summary judgment on them. *But see Hutchins*, 661 F.3d at 957 (affirming decision that parties consented to constructive amendment of the pleadings where the new claim was expressly addressed by both sides in the summary judgment briefing).

The Court thus concludes that Plaintiff's introduction of new factual theories in his summary judgment briefing is an "an unacceptable attempt to amend the pleadings

through summary judgment argument." *BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 900 F.3d 529, 541 (7th Cir. 2018) (citations omitted). Consequently, the Court opts to exercise its discretion to deny the constructive amendment and refuses to consider the new factual claims. That leaves only Plaintiff's original claim that Dr. Coe was deliberately indifferent by failing to ensure Plaintiff received adequate physical therapy. This conclusion in turn renders Dr. Tanner's opinion regarding Dr. Coe's failure to order additional diagnostic imaging irrelevant to any issue in the case. Dr. Coe's motion to bar this opinion is granted.

### 2. Merits of the Deliberate Indifference Claim

Plaintiff claims that Dr. Coe was deliberately indifferent by failing to ensure Plaintiff received adequate physical therapy. One aspect of this claim is that Plaintiff believed the physical therapy program at Lawrence was constitutionally inadequate and he should have been transferred to a different facility (*see* Doc. 1, Doc. 7). This argument is a non-starter. The medical professionals involved in Plaintiff's care and his own expert witness agreed that there was nothing inadequate about the therapy program or equipment available at Lawrence.

The other aspect of Plaintiff's claim is that Dr. Coe was deliberately indifferent when he issued orders for physical therapy evaluation but failed to ensure that they were carried out (Doc. 1; Doc. 106, p. 13). As a result, Plaintiff had no physical therapy services during Dr. Coe's tenure at Lawrence from May 2013 to July 2016, which Plaintiff contends

caused him to experience prolonged pain and hindered his ability to progress, leaving him confined to a wheelchair and unable to walk (Doc. 106).

The undisputed evidence, however, shows that Dr. Coe was not responsible for scheduling the physical therapy evaluations. That was the job of the nursing staff. Dr. Coe "could rely on other medical personnel to carry out [his] directives, though [he] could not turn a blind eye if it was obvious to [him] that other staff members were not following through on [his] orders." *Norwood v. Ghosh*, 723 Fed. Appx. 357, 366 (7th Cir. 2018) (citing *Minix v. Canarecci*, 597 F.3d 824, 834 (7th Cir. 2010) and *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012)). The record here might support a finding that Dr. Coe was negligent in failing to ensure his orders were carried out but not a finding that he consciously disregarded Plaintiff's pain, particularly in the context of the overall care Dr. Coe provided to Plaintiff. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) ("[W]e look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs.") (citation omitted). Dr. Coe saw Plaintiff *dozens* of times during the three years he was at Lawrence, many of them for Plaintiff's back pain. He kept Plaintiff supplied with Neurontin and Ultram for his pain and adjusted the dosages upward as necessary. He also added other medications from time to time to address Plaintiff's ongoing and increased pain. He monitored the condition of Plaintiff's spine with multiple x-rays. He admitted Plaintiff to the infirmary after a fall. He gave Plaintiff a permit for ice. Simply put, the record is replete with

evidence that Dr. Coe continuously monitored and provided Plaintiff with treatment responsive to his back pain.

Furthermore, there is no evidence suggesting it was blatantly inappropriate not to provide physical therapy services in addition to the other treatments Plaintiff was receiving. Plaintiff's expert witness opined that he believed it was "appropriate" for Dr. Coe to order physical therapy evaluations and he "would expect a physician" to do so given Plaintiff's circumstances (Doc. 106-5, pp. 17–19). However, saying that physical therapy is appropriate is not the same as saying it was essentially mandated by accepted professional standards, or that the failure to provide it was blatantly inappropriate and reckless, which is what Plaintiff is required to show. At most, Plaintiff's evidence shows that physical therapy was another potential treatment option and perhaps it would have been beneficial. But "medical professionals may choose from 'a range of acceptable courses based on prevailing standards in the field,'" *Walker*, 940 F.3d at 965 (quoting *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008), and "evidence that *some* medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim." *Petties*, 836 F.3d at 729 (emphasis in original).

For these reasons, no reasonable jury could find that Dr. Coe was deliberately indifferent to Plaintiff's serious medical needs and Dr. Coe is entitled to summary judgment on Count 1.

## B.  ADA/RA CLAIM

Both the Americans with Disabilities Act and the Rehabilitation Act prohibit

discrimination against the disabled. *CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014); 42 U.S.C. §12132; 29 U.S.C. § 794(a). Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehab Act similarly provides "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity." 29 U.S.C. § 794(a). Because the two statutes, as well as the federal regulations implementing them, are "materially identical," they are interpreted and applied in a consistent manner. *A.H. by Holzmueller v. Illinois High Sch. Ass'n*, 881 F.3d 587, 592 (7th Cir. 2018) (citing *Steimel v. Wernert*, 823 F.3d 902, 909 (7th Cir. 2016)).[10] For the sake of ease, the Court refers only to the ADA throughout the course of the analysis.

### 1. Expert Testimony

Peter Combs ("Mr. Combs"), is the Plaintiff's retained expert witness regarding his ADA/Rehabilitation Act claim against the IDOC. Mr. Combs became a registered architect in 1973 and worked for over 30 years as a practicing architect (Doc. 105-2). He

---

[10] The only notable difference is that the Rehabilitation Act includes as an additional requirement the receipt of federal funds, but this element is incontrovertible because all states accept it for their prisons. *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015); *Jaros v. Illinois Dep't of Corr.*, 685 F.3d 667, 671–72 (7th Cir. 2012).

considers ADA compliance one of his areas of expertise, and he has served as an expert witness in over 200 cases (Doc. 105-2). He was provided with photos, diagrams, and measurements that Defendants produced in discovery, and offered his opinion that various aspects of Lawrence Correctional Center were not in compliance with the ADA (Doc. 105-1). Specifically, he opined that providing only a standard portable toilet on the yard, but not a wheelchair-accessible toilet did not comply with the ADA (Doc. 105-1). He also stated that the accommodation provided to disabled inmates—flagging down a guard to escort them back to the cell house— was not an equal benefit because non-disabled inmates did not have to contact a guard, did not have to be escorted to and from the yard, and did not lose time on the yard when they had to go to the bathroom (Doc. 105-1). He further opined that the grab bars in Plaintiff's cell did not comply with the ADA accessibility standards because they were too high and the terrain on the route Plaintiff traveled was too rough to be suitable for a wheelchair (Doc. 105-1).

The IDOC moved to bar Mr. Comb's testimony, arguing he was not qualified to issue opinions in this case and his opinions are irrelevant (Doc. 100). Turning first to Mr. Combs's qualifications, the IDOC asserts that Mr. Combs is not qualified to offer opinions because he retired from working as an architect 15 years ago, he has never worked on the design or update of any prison, and he has never worked as an ADA coordinator (Doc. 100). The Court, however, agrees with Plaintiff that none of these things, on their face, make Mr. Combs unqualified to serve as an expert witness on ADA compliance (*see* Doc. 105). And Defendants do not provide any explanation or citation to legal authority to

support their assertions (*see* Doc. 100). The reality is that Mr. Combs has considerable experience designing commercial and residential spaces and ensuring their compliance with the ADA (*see* Doc. 105, Doc. 105-2, Doc. 105-3). Defendants have not given the Court any reason to doubt that he's qualified by his knowledge, experience, and training to issue opinions regarding the IDOC's ADA compliance.

As for the relevance of Mr. Combs's opinions, Defendants argue the opinions regarding the terrain and indoor bathroom in Plaintiff's cell are irrelevant because they are outside the scope of the allegations in Count 2 (Doc. 100). In Count 2, Plaintiff was permitted to proceed on a claim that the IDOC violated the ADA and the Rehab Act when it "failed to install wheelchair accessible toilets" on the prison yard (Doc. 7). The original complaint does *not* mention the terrain at Lawrence or the grab bars in Plaintiff's cell (*see* Doc. 1), and Plaintiff never sought to amend his complaint to add such allegations. Plaintiff argues, however, that his complaint was constructively amended to include claims related to these issues. A pleading can be constructively amended when both parties expressly or implicitly consent to it. *Hutchins v. Clarke*, 661 F.3d 947, 957 (7th Cir. 2011) (citing FED. R.CIV. P. 15(b)). "The test for consent is 'whether the opposing party had a fair opportunity to defend and whether he could have presented additional evidence had he known sooner the substance of the amendment.'" *Hutchins*, 661 F.3d at 957

Here, Defendants admit that following Plaintiff's deposition—where he referenced the terrain at Lawrence, the bathroom in his cell, and the ADA gym

bathroom—Plaintiff's counsel asked for diagrams and measurements of these areas as well as additional measurements of the outdoor porta-potty (Doc. 100, p. 2), which Defendants produced (*see* Doc. 107-2, pp. 24–38). Additionally, Plaintiff's corporate representative deposition notice, which was served on April 30, 2019, indicated that Plaintiff intended to ask about the dimensions and layout of the cells, hallways, and bathrooms at Lawrence (Doc. 107-2, pp. 24–38). Those issues, including the specifications of the grab bars in Plaintiff's cell, were brought up and discussed at the deposition of Deana Brookhart on May 1, 2019 (Doc. 107-2). The issues were also raised in Mr. Combs's expert report and defense counsel discussed them with Combs at his deposition (Docs. 107-3, 107-4). Given that Defendants were on notice of the new issues and actively participated in discovery related to them, the Court concludes that they impliedly consented to a constructive amendment of the complaint to include claims that the IDOC violated the ADA with respect to the terrain at Lawrence and the bathroom in Plaintiff's cell. This conclusion, in turn, means that Mr. Combs's opinions regarding the terrain and indoor bathrooms are *not irrelevant* to the issues in the case. As explained further below, however, the Court is inclined to grant summary judgment to the IDOC pursuant to Rule 56(f) on these two new issues.

As for Mr. Combs's opinion that the porta-potty on the yard was not ADA accessible, Defendants argue "no expert was needed for that opinion [and] the issue in the case is whether the Defendant IDOC provided a sufficient reasonable accommodation . . . and he has no authority or basis for such an opinion" (Doc. 100, p. 7). It is true that no

expertise is required to determine that the porta-potty on the yard was not wheelchair-accessible—it is readily apparent and observable to even a layperson. However, the jury may find it helpful to hear the ADA's technical requirements for toileting facilities and why exactly the porta-potty on the yard did not comply with those requirements. It is less clear whether Mr. Combs should be allowed to testify that the accommodations offered to disabled inmates did not provide equal access. It can be reasonably inferred that his work designing buildings to comply with the ADA required consideration of whether accommodations provided equal access, but whether equal access is provided seems to be a legal issue that the jury should decide. The parties' briefing does not allow the Court to make the determination. However, the Court need not go out of its way to conduct its own research on the issue because it does not rely on Mr. Combs' opinion regarding equal access in denying the motion for summary judgment. Consequently, this portion of the motion is denied. The denial is without prejudice to Defendants renewing their argument in a pre-trial motion.

## 2. Merits of the ADA claim re: Outdoor Porta-Potty

To succeed on his claim of disability discrimination, Plaintiff must prove three basic elements: (1) he was a qualified individual with a disability; (2) he was excluded from or denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination; and (3) the exclusion, denial of benefits, or discrimination was because of his disability. *P.F. by A.F. v. Taylor*, 914 F.3d 467, 471 (7th Cir. 2019); *Lacy v. Cook Cty., Illinois*, 897 F.3d 847, 853 (7th Cir. 2018) (quoting *Love v.*

*Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996)).

Here, the IDOC does not dispute that Plaintiff is a qualified person with a disability (Doc. 85, p. 14). And it is well-established that the IDOC is a public entity within the meaning of the ADA and has always been subject to the nondiscrimination and accessibility requirements of Title II. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (per curiam). There is also no dispute that the provision of appropriate toilet facilities is a "service, program, or activity" within the meaning of the ADA (*see* Doc. 85). *See Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012); *Clemons v. Dart*, 168 F. Supp. 3d 1060, 1066 (N.D. Ill. 2016); 28 C.F.R. § 35.102(a) (The ADA applies to "all services, programs, and activities provided or made available by public entities."); 28 C.F.R. § Pt. 35, App. B (2011) ("[T]itle II applies to anything a public entity does."). To the extent that Plaintiff was not able to use the toilet on the yard and was required to use other toilets, it is self-evident that it was because of his disability. *See Wisconsin Community Services v. City of Milwaukee*, 465 F.3d 737, 752 (7th Cir. 2006) (To establish this element, Plaintiff must "show that, 'but for' his disability, he would have been able to access the services or benefits desired.") The only dispute pertains to the second element and whether Plaintiff was excluded from or denied the benefits of the toilets or otherwise subjected to discrimination.

The purpose of the ADA is to eliminate the segregation and isolation of disabled individuals and ensure that disabled individuals are fully integrated and able to participate in all aspects of society. 42 U.S.C. §12101; 28 C.F.R. Pt. 35, App. B (1991);

Samuel R. Bagenstos, *Subordination, Stigma, and "Disability,"* 86 VA. L. REV. 397, 434–35 (2000). Title II of the ADA, which applies to public services, not only prohibits public entities from intentionally discriminating against disabled individuals, but it also imposes an obligation to provide "reasonable accommodations" or "reasonable modifications" for the disabled to ensure they have meaningful access to the benefits of the programs, services, and activities that such entities provide. *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 908 (6th Cir. 2004) (discussing *Tennessee v. Lane*, 541 U.S. 509 (2004)); *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 748 (7th Cir. 2006) ("[T]he Rehabilitation Act requires public entities to modify federally assisted programs if such a modification is necessary to ensure that the disabled have equal access to the benefits of that program."). *See also Lacy v. Cook Cty., Illinois*, 897 F.3d 847, 853 (7th Cir. 2018) ("It is well established that a failure to make 'reasonable modifications in policies, practices, or procedures' can constitute discrimination under Title II."); *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012) ("Refusing to make reasonable accommodations is tantamount to denying access.").

More specifically, and pertinent to this case, under Title II, disabled individuals cannot be excluded from or denied the benefits of the public entity's services, programs, or activities because the entity's "facilities are inaccessible to or unusable by individuals with disabilities." 28 C.F.R. § 35.149. *See also Lane*, 541 U.S. at 536 ("Recognizing that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion, Congress required the States to take reasonable measures to

remove architectural and other barriers to accessibility." (citing 42 U.S.C. § 12131(2)));

*Lacy v. Cook Cty., Illinois*, 897 F.3d 847, 853 (7th Cir. 2018) ("Perhaps the most obvious example of such discrimination is when structural barriers prevent people with disabilities from accessing otherwise available public services.") Facilities like Lawrence that were built or altered after January 26, 1992—which was the effective date of the ADA—must be "readily accessible to and usable by individuals with disabilities."[11] 28 C.F.R. §§ 35.151(a)(1); *id.* at 35.151(b)(1) (requiring a newly altered facility to be readily accessible and usable, "to the maximum extent feasible."). *See also Hummel v. St. Joseph Cty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) ("For public facilities built or altered after January 26, 1992, the public entity must ensure that the facility is not just possibly accessible but 'readily accessible.'")

"Readily accessible" and "usable" mean that the facility must be designed, constructed or altered in strict compliance with specific architectural accessibility standards, namely the Uniform Federal Accessibility Standards (UFAS) or the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (ADAAG). *Lane*, 541 U.S. at 532; 28 C.F.R. § 35.151(c)(1).[12] Full compliance is required and "[d]epartures

---

[11] Plaintiff's expert witness operated on the belief that construction on the Lawrence correctional center began sometime after 1998 and was completed, or nearly completed, by 2005 (*see* Doc. 105-1). Dr. Deana Brookhart testified that Lawrence was built in 2000 and opened in 2001 (Doc. 107-2, p. 13). While there is no precise answer as to when Lawrence was constructed, it is unanimous that it did not occur until after 1992. And although neither party discusses when the porta-potty was added to the yard, it also must have been sometime after 1992. Therefore, the accessibility requirements for new construction or alterations set forth in § 30.151 apply here.

[12] The Department of Justice issued the ADAAG in 1991 ("the 1991 Standards"), and they were revised in 2010. *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1076 (7th Cir. 2013). Given that Lawrence was built in 1999,

from particular requirements of either standard by the use of other methods [is only] permitted when it is clearly evident that equivalent access to the facility or part of the facility is thereby provided." 28 C.F.R. § 35.151(c)(1).[13]

Both the 1991 Standards and the UFAS dictate that "if [exterior] toilet facilities are provided on a site, then each such public or common use toilet facility shall comply with [the technical specifications of] 4.22."[14] 1991 Standards § 4.1.2(6). In the case of "single user portable toilet . . . units clustered at a single location, at least 5% but no less than one toilet unit . . . complying with 4.22 or 4.23 shall be installed at each cluster whenever typical inaccessible units are provided." *Id.* Simply put, if Lawrence has a toilet out on the yard, then it must meet the ADA requirements for accessibility. Lawrence cannot provide a toilet to only non-disabled inmates. *See, e.g., Ashby v. Warrick Cty. Sch. Corp.*, 908 F.3d 225, 232 (7th Cir. 2018) ("The mandate of Title II . . . is clear: whenever a public entity or federal funding recipient 'does . . . anything,' it must extend 'the benefits of,' and cannot 'discriminat[e]' in, that thing on the basis of disability."); *Frame v. City of Arlington*, 657 F.3d 215, 226 (5th Cir. 2011) ("[W]hen a city decides to build or alter a

_____

the 1991 Standards should be used to determine compliance. 28 C.F.R. § 35.151(c)(1). The 1991 Standards are available at https://www.ada.gov/1991standards/adastd94-archive.pdf.

[13] Full compliance with the accessibility requirements is also excused when it is "structurally impracticable to meet the requirements," which occurs "only in those rare circumstances when the unique characteristics of terrain prevent the incorporation of accessibility features." 28 C.F.R. § 35.151(a)(2)(i). The IDOC does not invoke this exception and therefore it does not apply here (*see* Docs. 85, 101).

[14] Specifications are provided regarding, for example, the height of the toilet, the location and height of grab bars, toilet paper dispensers, flush controls, mirrors, operation of the door, and the amount of clear floor space required.

sidewalk but makes that sidewalk inaccessible to individuals with disabilities without adequate justification, the city discriminates within the meaning of Title II. Such a sidewalk benefits persons without physical disabilities, yet that benefit is unnecessarily denied to similarly situated persons with physical disabilities.").

There is no dispute that Lawrence provided a portable toilet on the yard for non-disabled inmates but denied disabled inmates the same benefit by not providing a wheelchair-accessible toilet. Thus the Court can only conclude the IDOC did not comply with the specific requirements set forth in the accessibility standards. The IDOC nevertheless asserts that it did not violate the ADA because Plaintiff was provided with "sufficient accommodations" (Doc. 85, p. 14), Specifically, the IDOC pointed out that Plaintiff could be brought back in from the yard to use the indoor toilet or Plaintiff could use the ADA gym, where the toilet was accessible (Doc. 85, p. 14). Plaintiff, however, disputes whether those "accommodations" were "sufficient" (Doc. 107).

The Court agrees with Plaintiff. In this instance, the reasonable accommodation requirement is satisfied by compliance with the specific architectural accessibility standards. *Lane*, 541 U.S. at 532 ("Title II's implementing regulations make clear, the reasonable modification requirement can be satisfied in a number of ways. In the case of facilities built or altered after 1992, the regulations require compliance with specific architectural accessibility standards." (citing 28 CFR § 35.151 (2003))). As the Court just discussed, Lawrence did not comply with the accessibility standard because the toilet on the yard was not wheelchair accessible.

Deviations from the accessibility standards is only permitted if it is "clearly evident that equivalent access" to the facility was provided. 28 C.F.R. § 35.151(c)(1). It is unclear if the "equivalent access" provision applies to architectural accommodations, *see Clemons v. Dart*, 168 F. Supp. 3d 1060, 1067 (N.D. Ill. 2016), but even if it does, a reasonable jury could easily conclude that the accommodations provided at Lawrence to disabled inmates did not provide equivalent access. Non-disabled inmates were able to use the porta-potty on the yard without notifying a guard (Doc. 107-2, p. 11). If they had to use the restroom while out on the yard, they simply went and then resumed their activities on the yard. On the other hand, if Plaintiff had to use the restroom while out on the yard, he first had to wave down a guard. Then he had to ask the guard to escort him to his cellhouse and back out to the yard (Doc. 107-2, pp. 10, 13; *see* Doc. 85-11). He presented undisputed testimony that there were instances where he was not able to get a guard's attention or they refused to escort him inside. Plaintiff also testified that, for a period of time, if he went inside to use the toilet, he was not allowed to go back out to the yard. Thus, it is clear that the accommodations provided to disabled inmates on the yard did not provide equivalent access to the toilets. *See Clemons v. Dart*, 168 F. Supp. 3d 1060, 1066 (N.D. Ill. 2016) (holding inmate did not have equivalent access to the jail's toilets and showers when he was housed in non-ADA-compliant cell but had access to around-the-clock nursing care because "the availability of staff assistance upon request does not constitute equivalent access" under Title II); *Roberts v. Dart*, No. 16 C 5560, 2018 WL 1184735, at *4 (N.D. Ill. Mar. 7, 2018) (holding inmate did not have equivalent access to

the toilets at the jail when he was housed in non-ADA-compliant cell but could ask officers to let him out of his cell to use the toilet in the dayroom); *Tyler v. City of Manhattan*, 857 F. Supp. 800, 819 (D. Kan. 1994) (finding arrangement where disabled individual was required to request a key to use the only accessible bathroom did not comport with Title II).

As for using the ADA gym instead of the yard, its readily apparent that an indoor gym cannot be considered equivalent to the outdoor recreation yard. At any rate, the IDOC did not provide any evidence regarding the frequency and duration of the trips per week to the ADA gym for disabled inmates as compared to the outdoor yard for non-disabled inmates. Consequently, there is a dearth of evidence from which the Court could conclude the ADA gym provided equivalent access.

For these reasons, the IDOC is not entitled to summary judgment on Count 2, and this claim shall proceed to trial.

### 3. ADA claim re: Indoor Bathroom and Terrain

If Plaintiff wishes to pursue a claim that the IDOC violated the ADA/Rehab Act with respect to the terrain at Lawrence and the bathroom in Plaintiff's cell, he is ordered to file a motion for leave to amend the complaint on or before January 28, 2020. Plaintiff is cautioned, however, that the Court is inclined to grant summary judgment to the IDOC pursuant to Rule 56(f) on these two new issues.

With respect to the terrain, Plaintiff does not describe the surfaces, except to say they are blacktop and concrete.[15] There is no other description or photographs of the surface in question in the record (*see* Doc. 105-1). Consequently, to the extent Plaintiff's expert opines that the surfaces violated the design specifications of the ADA, his opinion is completely speculative. Plaintiff's deposition testimony also makes clear the terrain at Lawrence isn't the only thing that contributes to the breakdown of his wheelchair—he is also too big for his chair. Furthermore, at no point in his deposition did Plaintiff indicate that he is completely unable, or that it is difficult, to access any part of the facility due to the rough terrain (*see* Doc. 107-1). He also did not indicate that the terrain limited his ability to participate in any activities, services, or programs. For these reasons, there does not appear to be sufficient evidence to allow a reasonable jury to find that Plaintiff was excluded from or denied the benefits of a service, program, or activity at the prison, or otherwise discriminated against.

As for the bathroom in Plaintiff's cell, his expert, Mr. Combs, opines that the grab bars are not the proper height (Doc. 105-3, 105-4). However, Plaintiff did not so much as suggest that he was unable to use the toilet or that it was difficult to do so (*see* Doc. 107-1, pp. 125, 129). So while Lawrence might not have perfectly complied with the

---

[15] Plaintiff testified at his deposition:

> They got me in this little wheelchair, I need a large wheelchair now. . . . [T]hese [wheel]chairs are not built for the type of terrain that we're on. These, these chairs are for your house, in the hospital, this is not to run across concrete and blacktop and stuff on a regular daily basis, this is not built for that. . . . [T]he spokes and stuff is snapping out of the thing already. And this is a fairly new wheelchair, but again, it's not heavy enough for me. I'm too heavy for this wheelchair, it's too small.

(Doc. 107-1, p. 17).

accessibility specifications, there does not appear to be *any evidence* from which a reasonable jury could find that Plaintiff was excluded from, denied the benefits of, or otherwise discriminated against with respect to the toilet in his cell.

<sub>C</sub>ONCLUSION

The motion for summary judgment and supplement filed by Defendant John Coe (Docs. 82, 99) are **GRANTED**. Dr. Coe is **DISMISSED with prejudice** as a Defendant in this case. Judgment will be entered in his favor as to Plaintiff's claim for deliberate indifference (Count 1) at the conclusion of this case.

The motion for summary judgment and supplement filed by Defendants Illinois Department of Corrections, Louis Shicker, and Phil Martin (Docs. 84, 101) are **DENIED in part and MOOT in part.** It is moot as to Defendants Louis Shicker and Phil Martin. They are **DISMISSED with prejudice** as Defendants, and judgment will be entered in their favor as to Plaintiff's claim for deliberate indifference (Count 1) at the conclusion of this case. The motion for summary judgment is denied as to the IDOC on Plaintiff's ADA/Rehab Act claim (Count 2). This matter shall proceed to trial on that claim.

The motion to bar the testimony of Plaintiff's expert, Brendan Tanner (Doc. 98) is **GRANTED**. The motion to bar the testimony of Plaintiff's expert, Peter Combs (Doc. 100) is **DENIED**.

If Plaintiff wishes to amend the allegations of his ADA/Rehab Act claim, his motion for leave to amend is due on or before January 28, 2020.

**IT IS SO ORDERED.**

**DATED: January 7, 2020**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**